UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT ALEXANDER and JAMES LEE REED, individually and on behalf of all others similarly situated, | Civil Action No. _____ |
| Plaintiffs, | JURY TRIAL REQUESTED |
| v. | |
| WASHINGTON MUTUAL, INC., WASHINGTON MUTUAL BANK, WASHINGTON MUTUAL BANK fsb, and WM MORTGAGE REINSURANCE COMPANY, | Class Action |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiffs Robert Alexander and James Lee Reed ("Plaintiffs"), on behalf of themselves and a class of all others similarly situated, allege as follows:

### INTRODUCTION

1.      Washington Mutual, Inc., including certain participating subsidiaries (referred to herein collectively as "Washington Mutual" or the "Company"), a home mortgage lender, has violated the Real Estate Settlement Procedures Act of 1974 ("RESPA") by collecting illegal referral payments in the form of reinsurance premiums funneled through WM Mortgage Reinsurance Company ("WM Reinsurance"), its wholly-owned subsidiary or "captive" reinsurer.

2.      This is a proposed national class action brought by Plaintiffs on behalf of themselves and a class of all other similarly situated homeowners who obtained residential mortgage loans through Washington Mutual and paid for private mortgage insurance issued by insurers with whom Washington Mutual had captive reinsurance arrangements.

3.      Homeowners who buy a home with less than a 20% down payment are typically required to pay for private mortgage insurance.  Private mortgage insurance protects the lender in

the event of a default by the borrower.  The premium is paid by the borrower and is usually collected by the lender with the borrower's monthly payments.  Borrowers typically have no opportunity to comparison-shop or select the private mortgage insurer.

4.      Section 2607 of RESPA prohibits lenders from accepting kickbacks or referral fees from any person providing a real estate settlement service, including providers of private mortgage insurance.  Thus, a lender cannot legally accept a referral fee from the insurer issuing the private mortgage insurance policy on the borrower's home.

5.      Defendants have attempted to circumvent RESPA's prohibition against accepting kickbacks and unearned fees by arranging for the private mortgage insurer to pay an excessive portion of the private mortgage insurance premiums of borrowers—referred by Washington Mutual—to WM Reinsurance in the form of purported reinsurance premiums.

6.      While these payments to Washington Mutual's affiliated reinsurer were purportedly for "reinsurance" services, WM Reinsurance received these payments while assuming very little or no actual risk.  Since 1999, Washington Mutual's affiliated reinsurer has received over **$295 million** from leading primary mortgage insurers as it's "split" of borrowers' mortgage insurance premiums--$77 million in 2005 alone.  In stark contrast, its actual insurance losses as reflected in the total amount of claims paid with respect to such premiums were **zero**. In other words, the millions of dollars collected through the captive reinsurance arrangements far exceeded the value of any services rendered.

7.      This scheme constitutes disguised, unlawful referral fees in violation of RESPA's prohibition against kickbacks, as well as a violation of RESPA's ban on accepting a percentage of settlement-service fees other than for services actually performed.

### JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 and 12 U.S.C. § 2614.

9.     Venue is proper in this district under 28 U.S.C. § 1391(b) and 12 U.S.C. § 2614 because the real property involved in Plaintiffs' mortgage loan transactions is located in this district and a substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

### Plaintiffs

10.     Plaintiff Robert Alexander resides in Westminster, Maryland.  Plaintiff Alexander obtained a residential mortgage loan from Washington Mutual in December of 2005 for the purchase of a home, with a down payment of less than 20%, and was required to pay for private mortgage insurance.  Plaintiff Alexander paid for private mortgage insurance from an insurer with whom Washington Mutual had a captive reinsurance arrangement.

11.     Plaintiff James Lee Reed resides in Dover, Pennsylvania.  Plaintiff Reed obtained a residential mortgage loan from Washington Mutual in April of 2007 for the purchase of a home, with a down payment of less than 20%, and was required to pay for private mortgage insurance.  Plaintiff Bennet paid for private mortgage insurance from an insurer with whom Washington Mutual had a captive reinsurance arrangement.

### Defendants

12.     Defendant Washington Mutual, Inc. is a Washington corporation, with its corporate headquarters located at 1201 Third Avenue, Seattle, Washington.  Washington Mutual does business in all 50 states.  Washington Mutual, the parent company of Washington Mutual Bank fsb and WM Mortgage Reinsurance Company ("WM Reinsurance"), is a proper party to this action, as it was and is a recipient of the unlawful kickbacks and unearned fees described herein.  Upon information and belief, WM Reinsurance funnels reinsurance premiums to Washington Mutual.  Under RESPA Section 8(b), 12 U.S.C. 2607(b), it is unlawful for *any* person to accept any portion of an unearned fee.  Section 8(d) of RESPA, 12 U.S.C. § 2607(d), provides that a violator is jointly and severally liable for 3 times the amount paid for the settlement service.

13.     Defendants Washington Mutual Bank and Washington Mutual Bank, fsb are federally-charted savings associations, headquartered in Seattle, Washington.  Defendant Washington Mutual does business as "Washington Mutual Bank," "Washington Mutual Bank, FA" and "Long Beach Mortgage."

14.     Defendant WM Reinsurance is a Hawaii corporation.  Upon information and belief, WM Reinsurance is headquartered in Seattle Washington and reinsures loans originated by Washington Mutual in all fifty states.

## FACTUAL ALLEGATIONS

### A.     Washington Mutual's Operations

15.     Washington Mutual, Inc., a savings and loan holding company, operates through two banking subsidiaries—Washington Mutual Bank and Washington Mutual Bank fsb—as well as numerous nonbank subsidiaries, among which is WM Reinsurance.

16.     Through its subsidiaries, Washington Mutual, Inc. provides financial services to consumers and businesses, including retail banking, credit cards, home loans, commercial banking and other services.

17.     As of December 31, 2006, Washington Mutual, Inc. reported assets of approximately $346 billion.  Through its subsidiaries, Washington Mutual, Inc. operates nearly 2700 consumer and small business banking stores nationwide and has approximately 50,000 employees.

18.     Washington Mutual originates and services home mortgage loans as part of the home loans segment of Washington Mutual, Inc.  Washington Mutual is also one of the nation's largest subprime mortgage lenders, originating subprime loans under the name "Long Beach Mortgage."

19.     WM Reinsurance provides purported reinsurance coverage to primary mortgage insurers with respect to mortgage loans in Washington Mutual's mortgage servicing portfolio that are covered by private mortgage insurance.

**B.**     **Private Mortgage Insurance Industry**

     20.      In order to lessen risk of default, lenders typically prefer to finance no more than eighty percent of the value of a home, with the remaining twenty percent being paid as a down payment by the borrower. In the event of a default, the lender is then more likely to completely recover its investment.

     21.      Many potential homebuyers cannot afford to pay 20% of the purchase price as a down payment on a home. Private mortgage insurance allows the lender to make loans in excess of 80% of the home's value by providing a guarantee from a dependable third party -- the private mortgage insurer -- to protect the lender in the event of a default by the borrower.

     22.      Private mortgage insurers are typically unaffiliated third-party companies who agree to cover the first twenty to thirty percent of the amount of the potential claim, including unpaid principal, interest and certain expenses.

     23.      The amount of private mortgage insurance coverage required varies according to the perceived risk of default. The lower the percentage of the borrower's down payment, the more mortgage insurance required. For example, more private mortgage insurance is required with a five percent down payment than with a fifteen percent down payment. Additionally, more private mortgage insurance may be required for adjustable-rate mortgages than for fixed-rate mortgages.

     24.      While the lender is the beneficiary of the private mortgage insurance, the borrower pays the premiums, usually through an addition to the borrower's monthly mortgage payment.

     25.      Borrowers generally have no opportunity to comparison-shop for private mortgage insurance. The private mortgage insurer is selected by the lender. The terms and conditions of the insurance policy, as well as the cost of the policy, is determined by the lender and the private mortgage insurer rather than negotiated between the borrower and the private mortgage insurer.

26.     The private mortgage insurance industry began with the founding of Mortgage Guaranty Insurance Corp. ("MGIC") in 1957 and is dominated by MGIC and other companies, including, without limitation:  PMI Mortgage Insurance Company, Genworth Mortgage Insurance Corporation, Radian Guaranty Inc., United Guaranty Residential Insurance Company, Triad Guaranty Insurance Company and Republic Mortgage Insurance.  The industry is represented by a trade association known as Mortgage Insurance Companies of America ("MICA").

27.     According to MICA, new private mortgage insurance contracts for its member firms have consistently exceeded $200 billion per year since 1998.  MICA firms issued over 1.5 million new certificates of mortgage insurance in 2005, representing over $225 billion in new insurance written.

28.     Private mortgage insurance is limited to the conventional home loan market. Mortgage loans directly insured by the federal government via mortgage guaranty programs, such as those maintained by the Federal Housing Administration and the Veterans Administration, maintain their own form of mortgage default insurance.

**C.     RESPA Prohibits Kickbacks for Referrals and Fee-Splitting Related
         To Private Mortgage Insurance Policies**

29.     RESPA is the primary federal law regulating residential mortgage settlement services.  The United States Department of Housing and Urban Development ("HUD") is charged with interpreting RESPA.  HUD has promulgated the implementing rules for RESPA. *See* Regulation X, 24 C.F.R. § 3500.

30.     RESPA was enacted, in part, to curb the problem of kickbacks between real estate agents, lenders and other real estate settlement service providers.  "It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result . . . in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services."  12 U.S.C. § 2601(b).

31.    A key component of RESPA is its dual prohibition of referral fees and fee-splitting between persons involved in real estate settlement services.

32.    In 12 U.S.C. 2607(a) RESPA provides:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

33.    In 12 U.S.C. 2607(b) RESPA provides:

> No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

34.    Regulation X further explains, "A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section." 24 C.F.R. § 3500.14(c).

35.    The term "thing of value" is broadly defined in RESPA and further described in Regulation X as including:

> without limitation, monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties, credits representing monies that may be paid at a future date, the opportunity to participate in a money-making program, retained or increased earnings, increased equity in a parent or subsidiary entity…The term payment is used as synonymous with the giving or receiving any "thing of value" and does not require transfer of money.

24. C.F.R. § 3500.14(d).

36.    Private mortgage insurance business referred to private mortgage insurers by a lender constitutes "business incident to or a part of a real estate settlement service" within the meaning of RESPA, 12 U.S.C. § 2607(a).  The term "settlement service" is liberally defined in RESPA and Regulation X and includes the "provision of services involving mortgage insurance."  24 C.F.R. § 3500.2(b).

37.    Under RESPA, therefore, Washington Mutual and its affiliates are prohibited

from accepting referral fees from a private mortgage insurer or from splitting private mortgage insurance premiums with the insurer other than for services actually performed by the captive reinsurer.

38.     The damages recoverable for violating §8 of RESPA are set forth at 12 U.S.C. § 2607 (d) (2) which provides:

> Any person or persons who violate the prohibitions or limitations of this section shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service.

Thus, a borrower has a private right of action for recovery of three times the total charges for settlement services and need not allege an overcharge to have standing. *See eg. Kahrer v. Ameriquest Mortgage*, 418 F. Supp. 2d 748, 756 (W.D. Pa 2005).

**D.     Mortgage Reinsurance Industry**

39.     Private mortgage insurers may enter into contracts with reinsurers, whereby the reinsurer typically agrees to assume a portion of the private mortgage insurer's risk with respect to a given pool of loans.  In return, the private mortgage insurer pays to the reinsurer a portion of the premiums it receives from borrowers with respect to the loans involved.

40.     Mortgage reinsurance arrangements can generally take two forms: (a) "quota share" and (b) "excess loss."

41.     In a quota share reinsurance arrangement, the reinsurer agrees to assume a fixed percentage of all the private mortgage insurer's insured losses.  Thus, if the private mortgage insurer experiences losses, the reinsurer is certain to experience losses in the percentage agreed upon in the reinsurance coverage.

42.     In an excess loss reinsurance arrangement, however, the reinsurer is liable only for claims, or a percentage thereof, above a particular ceiling.  Unlike the quota share arrangement, the excess loss method does not necessarily result in any loss being shifted to the reinsurer.

43.     The likelihood of the reinsurer experiencing any losses under this arrangement depends not only on the amount of losses by the private mortgage insurance, but also on whether the reinsurance agreement between the reinsurer and the private mortgage insurer sets the excess loss level at an amount where the reinsurer bears actual risk of loss.

E.      **Captive Mortgage Reinsurance Arrangements and HUD's Concern About RESPA Anti-kickback Violations Under Such Arrangements**

44.     Lenders produce customers for private mortgage insurers.  Certain lenders, seeking to capitalize on the billions of dollars their borrowers pay to these insurers in premiums each year, have established their own affiliated or "captive" reinsurers.  These captive reinsurers provide reinsurance primarily or exclusively for loans the lender originates that require the borrower to pay for private mortgage insurance.

45.     Under "captive reinsurance arrangements," the lender refers its borrowers to a private mortgage insurer who agrees to reinsure with the lender's captive reinsurer.  These arrangements require the private mortgage insurer to cede a percentage of the borrowers' premiums to the lender's captive reinsurer.

46.     Captive mortgage reinsurance arrangements raise obvious RESPA kickback problems.  Private mortgage insurers are dependent on the lender to obtain business, while the lender is collaborating with the insurer to obtain a share of the borrower's premium revenue through its captive reinsurer.  The insurer stimulates its business by providing a lucrative stream of revenue for the lender via the lender's captive reinsurer.

47.     Simply put, as opposed to receiving direct payments for referring its customers to a certain private mortgage insurer, an unscrupulous lender can use a captive reinsurance arrangement to funnel such unlawful kickbacks to itself or an affiliate.

48.     Concerned that these transactions would be designed to disguise a funneling of referral fees back to the lender who arranged for the private mortgage insurer to obtain the business, HUD issued a letter dated August 6, 1997 ("HUD letter") addressing the problem of captive reinsurers and RESPA's anti-kickback violations.

49.     The HUD letter concluded that captive reinsurance arrangements were permissible under RESPA only "if the payments to the affiliated reinsurer: (1) are for reinsurance services 'actually furnished or for services performed' and (2) are bona fide compensation that does not exceed the value of such services" (emphasis in original).

50.     The HUD letter focuses the RESPA anti-kickback analysis on whether the arrangement between the lender's captive reinsurer and the private mortgage insurer represents "a real transfer of risk." HUD warned that "The reinsurance transaction cannot be a sham under which premium payments... are given to the reinsurer even though there is no reasonable expectation that the reinsurer will ever have to pay claims."

51.     The HUD letter states "This requirement for a real transfer of risk would clearly be satisfied by a quota share arrangement, under which the reinsurer is bound to participate pro rata in every claim" (emphasis in original).

52.     In contrast, HUD states that excess loss reinsurance contracts can escape characterization as a referral fee or fee-split only:

> ...if the band of the reinsurer's potential exposure is such that a reasonable business justification would motivate a decision to reinsure that band. Unless there is a real transfer of risk, no real reinsurance services are actually being provided. In either case, the premiums paid...must be commensurate with the risk.

53.     Notably, state insurance commissioners and federal regulators have investigated and condemned similar captive reinsurance arrangements in the title insurance industry as sham transactions designed to funnel unlawful kickbacks for business referrals. As a result, a number of title insurance providers have abandoned such arrangements altogether.

54.     The National Association of Insurance Commissioners ("NAIC") also has addressed the accounting treatment of premiums ceded to captive mortgage reinsurers. Under the annual statement requirements of the NAIC, private mortgage insurers should not treat as authorized reinsurance amounts ceded to lender-captive reinsurers where adequate risk is not transferred. Rather, such amounts should be accounted for under the less beneficial deposit accounting guidelines and identified as though unauthorized accounting was being utilized.

10

55.     In connection with the billions of dollars in home loans originated by Washington Mutual, many of its borrowers pay for private mortgage insurance.

56.     Pursuant to "captive reinsurance arrangements," Washington Mutual refers borrowers to private mortgage insurers, who agree to reinsure with WM Reinsurance. These insurers include at least: PMI Mortgage Insurance Company, Genworth Mortgage Insurance Corporation, Mortgage Guaranty Insurance Company, Radian Guaranty Inc., United Guaranty Residential Insurance Company, Triad Guaranty Insurance Company and Republic Mortgage Insurance.

57.     Washington Mutual has a strong financial interest in steering business to private mortgage insurers who, in turn, agree to reinsure with WM Reinsurance on terms that will produce significant kickbacks.

58.     WM Reinsurance enters into reinsurance agreements solely with respect to loans originated by Washington Mutual and its affiliates. Thus, borrowers from Washington Mutual are forced to pay, indirectly, for reinsurance premiums forwarded to WM Reinsurance.

59.     Under Washington Mutual's captive reinsurance arrangements, the primary insurer pays WM Reinsurance a percentage of the premiums paid by borrowers on a particular pool of loans; in return, WM Reinsurance purportedly agrees to assume a portion of the insurer's risk with respect to the loans involved.

60.     Unbeknownst to borrowers, little or no risk is actually transferred from the primary insurer to WM Reinsurance in exchange for the insurer payments to WM Reinsurance. The actual risk, if any, transferred to WM Reinsurance under its secret "reinsurance" agreements is not commensurate with the premiums it extracts from the private mortgage insurer.

61.     Upon information and belief, WM Reinsurance received hundreds of millions of dollars in "reinsurance" premiums since 2000.

62.     For example, from 2000 through 2005, Washington Mutual, through its captive reinsurer, collected from private mortgage insurers approximately $295,458,000 as its "share" of

borrower's private mortgage insurance premiums. In contrast, its "share" of paid insured losses was zero:

| YEAR | PREMIUMS RECEIVED BY REINSURER | LOSSES PAID BY REINSURER |
|---|---|---|
| 2005 | $77,879,000 | $0 |
| 2004 | $73,691,000 | $0 |
| 2003 | $50,163,000 | $0 |
| 2002 | $73,691,000 | $0 |
| 2001 | $14,217,000 | $0 |
| 2000 | $5,817,000 | $0 |
| **TOTAL:** | **$295,458,000** | **$0** |

63. The numbers speak for themselves. Upon information and belief, this trend of collecting premiums that far exceed the value any risk actually transferred has continued through the present.

64. As HUD noted during its recent testimony by Assistant Secretary for Regulatory Affairs and Manufactured Housing Gary M. Cunningham before the United States Congress (referring to analogous captive reinsurance arrangements in the title insurance industry):

> [W]hen there is a history of little or no claims being paid, or the premium payments to the captive reinsurer far exceed the risk borne by the reinsurer, there is strong evidence that there is an arrangement constructed for the purpose of payment of referral fees or other things of value in violation of Section 8 of RESPA.

65. The millions of dollars collected by Washington Mutual through its captive reinsurer have clearly not been commensurate to its actual risk exposure. Washington Mutual has received millions of dollars in payments, while bearing little or no risk of loss.

66.     In reality, Washington Mutual's captive reinsurance arrangements were and are sham transactions for collecting illegal kickbacks in return for referring private mortgage insurance business to certain insurers.

67.     The money Washington Mutual collected through its captive reinsurer far exceeded the value of the services, if any, it performed.  There was no real transfer of risk or, at least, not a commensurate transfer of risk.  The amounts paid were simply disguised kickbacks to Washington Mutual for the referral of borrowers to private mortgage insurers.

68.     These arrangements keep premiums for private mortgage insurance artificially inflated because a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are simply funding illegal kickbacks to lenders.  In other words, because the money collected by a lender through its captive reinsurer comes from borrowers' mortgage insurance premiums, borrowers are essentially required to pay for *both* actual private mortgage insurance coverage *and* private mortgage insurers' unlawful kickbacks to lenders.

69.     Amounts paid to lenders as unlawful kickbacks have become a part of the cost of doing business for private mortgage insurers.  As a result, private mortgage insurance premiums incorporate the payment of such kickbacks -- to the detriment of consumers.

## CLASS ACTION ALLEGATIONS

70.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of a general class consisting of all persons who obtained federally-related residential mortgage loans through Washington Mutual and/or its subsidiaries and, in connection therewith, purchased private mortgage insurance and whose residential mortgage loans were included within Washington Mutual's captive mortgage reinsurance arrangements (the "Class").

71.     The Class excludes Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.

72.     The Class is so numerous that joinder of all members is impracticable.

73.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

74.     Plaintiffs' claims are typical of the claims of the Class.

75.     There are questions of law and fact common to the Class, including but not limited to:

     a.    Whether Defendants' captive reinsurance arrangements involved sufficient transfer of risk;

     b.    Whether payments to Washington Mutual's captive reinsurer were *bona fide* compensation and solely for services actually performed;

     c.    Whether payments to Washington Mutual's captive reinsurer exceeded the value of any services actually performed;

     d.    Whether Defendants captive reinsurance arrangements constituted unlawful kickbacks from private mortgage insurers;

     e.    Whether Defendants accepted a portion, split or percentage of borrowers' private mortgage insurance premiums other than for services actually performed; and

     f.    Whether Defendants are liable to Plaintiffs and the Class for statutory damages pursuant to RESPA § 2607(d)(2).

76.     These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.

77.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have no claims antagonistic to those of the Class.  Plaintiffs have retained counsel competent and experienced in complex nationwide class action litigation. Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Class.

78.     Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class, which would establish incompatible standards of conduct for Defendants.

79.     Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the class would create a risk

of adjudications with respect to individual members of the class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

80.     Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

81.     Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of RESPA, 12 U.S.C. § 2607

82.     Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

83.     Throughout the Class Period, Defendants provided "settlement services" in respect of "federally-related mortgage loans," as such terms are defined by RESPA §§ 2602(1) and (3).

84.     The amounts received by Defendants through Washington Mutual's captive reinsurance arrangements constituted "things of value" within the meaning of RESPA § 2602(2).

85.     Plaintiffs and the Class obtained federally-related residential mortgage loans through Washington Mutual and paid millions of dollars for private mortgage insurance premiums in connection with their real estate closings.  Defendants arranged for an unlawfully excessive split of borrowers' premiums to be paid to WM Reinsurance.

86.     The millions of dollars in premiums accepted from private mortgage insurers: (a) were not for services actually furnished or performed; and/or (b) exceeded the value of such services.

87.     The millions of dollars accepted by Washington Mutual through its captive reinsurance arrangements constituted fees, kickbacks or things of value pursuant to agreements with private mortgage insurers that business incident to real estate settlement services involving federally-related mortgage loans would be referred to such insurers.  Such practice violated RESPA, 12 U.S.C. 2607(a).  WM Reinsurance—Washington Mutual's subsidiary—participated in the scheme and served as the direct conduit by which the kickbacks were funneled.  WM Reinsurance agreed to provide purported "reinsurance" services involving mortgage insurance paid by Plaintiffs and the Class.

88.     In connection with transactions involving federally-related mortgage loans, Washington Mutual accepted a portion, split or percentage of charges received by private mortgage insurers for the rendering of real estate settlement services other than for services actually performed, in violation of RESPA, 12 U.S.C. 2607(b).  The money paid by private mortgage insurers to Washington Mutual and accepted by Washington Mutual through its captive reinsurer was a portion, split or percentage of the private mortgage insurance premiums paid by Washington Mutual's customers.  WM Reinsurance—Washington Mutual's subsidiary—participated in the scheme and served as the direct party to which the split was paid. WM Reinsurance agreed to provide purported "reinsurance" services involving mortgage insurance paid by Plaintiffs and the Class.

89.     Plaintiffs and the Class were harmed by Defendants' unlawful kickback scheme.

90.     First, Plaintiffs and the Class were overcharged for mortgage insurance.  Under Washington Mutual's scheme, the mortgage insurance premiums paid by Plaintiffs and the Class necessarily and wrongly included payments for both: (a) actual mortgage insurance services; and (b) payments unlawfully kicked back to Washington Mutual's captive reinsurer that far exceeded the value of any services performed and, were, in fact, illegal referral fees. Plaintiff does not

challenge private mortgage insurers' rates, but rather the use of the premiums to fund kickbacks and referral fees.

91.      Second, regardless of whether Plaintiffs and the Class were overcharged for private mortgage insurance, and regardless of the reasonableness or unreasonableness of the rates Plaintiffs paid for private mortgage insurance under RESPA, Plaintiffs and the Class were entitled to purchase settlement services from providers that did not participate in unlawful kickback schemes and are entitled to recover from Washington Mutual statutory damages in an amount equal to three times the amount they paid for private mortgage insurance.

92.      Defendants therefore violated RESPA, 12 U.S.C. 2607.  Pursuant to RESPA, 12 U.S.C. 2607(d), Defendants are liable to Plaintiffs and the Class in an amount equal to three times the amounts they have paid or will have paid for private mortgage insurance as of the date of judgment.

93.      Pursuant to 12 U.S.C. 2607(d), Plaintiffs also seek attorneys' fees and costs of suit.

## TOLLING OF STATUTE OF LIMITATIONS

94.      Applicable statutes of limitation may be tolled based upon principles of equitable tolling, fraudulent concealment and/or the discovery rule.  Equitable tolling is available under RESPA and should apply to the circumstances of this case.  Plaintiffs and putative Class members could not, despite the exercise of due diligence, have discovered the underlying basis for their claims.  No information was provided to Plaintiffs or putative class members at closing of their loans that would not lead them to suspect that Defendants were using private mortgage insurance premiums as a means of collecting kickbacks and referral fees.  Further, Defendants knowingly and actively concealed the basis for the Plaintiffs' claims by engaging in a scheme that was, by its very nature and purposeful design, self-concealing.  For these reasons, any delay by the members of the putative Class whose claims accrued outside of the applicable statute of limitations was excusable.

95.     Due to the undisclosed and self-concealing nature of Washington Mutual's scheme to collect illegal kickbacks from private mortgage insurers, the putative Class members whose claims would have otherwise accrued outside of the applicable statute of limitations did not possess sufficient information or possess the requisite expertise in order to enable them to discover the true nature of Defendants' captive reinsurance arrangements.

96.     This complex action is dissimilar to a case where, for example, an attentive borrower may determine—from a careful examination of the HUD-1 settlement statement—that he was overcharged for a settlement service or that too much money is being paid from the proceeds to the lender, real estate agent, title insurer or other settlement service provider. Rather, conduct described herein occurs behind closed doors, pursuant to secret agreements with a trail impossible for the average homeowner to follow.

97.     Plaintiffs were able to discover the underlying basis for the claims alleged herein only with the assistance of counsel. Plaintiffs and the putative Class members had no basis upon which to investigate the validity of the undisclosed payments to WM Reinsurance for purported reinsurance. Putative Class members' delay was excusable because they did not discover, and reasonably could not have discovered Defendants' conduct as alleged herein absent specialized knowledge and/or assistance of counsel.

98.     Further, Washington Mutual engaged in affirmative acts to conceal the facts and circumstances giving rise to the claims asserted herein. Washington Mutual affirmatively represented to Plaintiffs and the Class that any amounts it received from its captive reinsurance arrangements were for services actually performed. Pursuant to RESPA § 2604(c) and the accompanying regulations set forth in 24 C.F.R. 3500.7, if Washington Mutual required the use of a particular provider of settlement service, it was obligated to describe the nature and details of the relationship between Washington Mutual and such provider. It failed to do so.

99.     The putative Class members did not possess sufficient information to even put them on notice of the true nature of Washington Mutual's captive reinsurance arrangements. The average borrower is not an insurance expert and could not investigate and evaluate transfer

18

of risk of loss between insurance companies. Many borrowers are unfamiliar with the concept of reinsurance. Simply being told that Washington Mutual may enter into reinsurance relationships is absolutely insufficient to put the average borrower on notice that anything improper or actionable may have occurred with respect to that reinsurance or that his rights under RESPA may be violated. Washington Mutual intentionally designed any disclosure that it provided in such a manner to conceal from the putative class members information sufficient to put them notice of the underlying basis for their claims. Thus, the putative class members were not put on notice of Washington Mutual's wrongdoing. *See Boudin v. Residential Essentials, LLC*, No. 07-0018, 2007 WL 2023466 at * 5 (S.D. Ala. 2007). For instance, Washington Mutual did not disclose to borrowers that WM Reinsurance was not actually assuming any risk of loss. Thus, Washington Mutual concealed information that could have put the putative Class members on notice that there was inadequate assumption of risk by WM Reinsurance.

100.    The putative class members exercised due diligence by fully participating in their loan transactions and reviewing relevant loan documents. Because of Defendants' actions and because of the nature of the reinsurance scheme, Plaintiffs and the absent putative Class members were not put on notice of Defendants' wrongdoing despite exercising due diligence. *Boudin*, 2007 WL 2023466 at * 5.

101.    Washington Mutual provided misleading information to Plaintiffs and the Class, thus affirmatively acting to conceal its unlawful kickback scheme. By funneling kickbacks through WM Reinsurance and representing that such payments were for services actually performed, rather than referral fees, Washington Mutual acted to conceal and prevent Plaintiff from discovering the underlying basis for this action. Any delay by the absent putative Class members is excusable and, accordingly, Plaintiffs and the Class contend that it would be inequitable for the Court to apply the one-year limitation period set forth in RESPA § 16, 12 U.S.C. § 2614, in a way that would preclude the claim of any Class member.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs requests that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Class and award the following relief:

A.     This action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as representatives of the Class and Plaintiffs' counsel as counsel for the Class;

B.     The conduct alleged herein be declared, adjudged and decreed to be unlawful;

C.     Plaintiffs and the Class be awarded statutory damages pursuant to RESPA § 8(d)(2), 12 U.S.C. § 2607(d)(2);

D.     An order granting Plaintiffs and the Class costs of suit, including reasonable attorneys' fees and expenses; and

E.     An order granting Plaintiffs and the Class such other, further and different relief as the nature of the case may require or as may be determined to be just, equitable and proper by this Court.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demands a trial by jury as to all claims in this action.

Dated:  October 22, 2007

Respectfully submitted,
SCHIFFRIN BARROWAY TOPAZ &
KESSLER, LLP


JHM 6596
Joseph H. Meltzer, Esq.
Edward W. Ciolko, Esq.
Mark K. Gyandoh, Esq.
Joseph A. Weeden, Esq.
280 King of Prussia Road
Radnor, PA   19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

-and-

Alan R. Plutzik, Of Counsel
Robert M. Bramson, Of Counsel
2125 Oak Grove Blvd., Suite 120
Walnut Creek, CA 94598
Telephone: (925) 945-0770
Facsimile: (925) 945-8792

TRAVIS & CALHOUN, P.C.
Eric G. Calhoun, Esq.
Richard J. Pradarits Jr.
1000 Providence Towers East
5001 Spring Valley Road
Dallas, Texas 75244
Telephone: (972) 934-4100
Facsimile: (972) 934-4101

BERKE, BERKE & BERKE
Andrew L. Berke, Esq.
420 Frazier Avenue
Chattanooga, TN 37402
Telephone: (423) 266-5171
Facsimile: (423) 265-5307

**ATTORNEYS FOR PLAINTIFF**